BELL *v.* PIDGEON and the Scow No. 1.

*(District Court, E. D. New York. January 3, 1881.)*

1. COMMON CARRIER—PERIL OF THE SEAS—DAMAGE BY SWELL OF PASSING BOATS—NEGLIGENCE.

Where a scow, built and used by a party for his own transportation business, was at one time hired out by him to carry a load of chalk for another party up the East river at New York, and in passing up in tow of a tug, on a hawser, was met and passed on each side by two steam-boats, that raised such a swell as to make the scow roll her load of chalk overboard, and an action was brought to recover damages, *held*, that the owner of the scow was not a common carrier, and no negligence on his part or that of his agents being shown, was not liable for the loss of the chalk, although there was no exemption of "peril of the seas" in the contract made by him; he was only a bailee for hire.

A ship-owner who carries goods on his ship for hire will not, by reason of his acceptance of the goods, be held liable as an insurer, in the absence of any stipulation to the contrary, against everything but the act of God and the public enemy, as is a common carrier.

In Admiralty.

*Sidney Chubb*, for libellant.

*Beebe, Wilcox & Hobbs*, for defendant.

BENEDICT, D. J. This action is brought to recover the value of a quantity of chalk lost while being transported through the East river upon a vessel called Scow No. 1, owned by the defendant. The occupation of the defendant is that of a dock and bridge builder. In his business he had occasion to transport dirt and stones, and for that purpose he owned and used several scows—flats constructed solely to carry rough matter upon their decks, and moved by means of tugs. The defendant employed these scows for the most part in his own business, but he sometimes chartered a scow to other parties by the day or the month. He was not in the carrying trade, and was not in the habit of transporting any cargo except his own. His scows, when employed by him, were used solely to transport his own articles in his own business; when chartered to others, any transporting done by means of them was done at the expense of the charterer.

In the present instance the libellant applied to the defendant to carry for him a quantity of chalk from along-side the ship Ruby, in the North river, to Newtown creek, at so much per ton. The employment was accepted, and, in pursuance thereof, about 200 tons of chalk were thereafter laden on Scow No. 1 to be transported on the deck thereof through the East river to Newtown creek. The method of loading the chalk upon deck was in accordance with the understanding of the parties, and no fault is shown either in regard to the quantity of chalk taken on board the scow, or in regard to the method of stowing it. When loaded the scow was taken in tow by a tug belonging to the defendant, and proceeded on her way to Newtown creek. While passing up the river three large sound steamers were met about off Grand street, coming down the stream nearly abreast. The tug, with the scow upon a hawser astern, was about in the middle of the river, going at half speed. As the steamers approached, the tug blew her whistle several times, and when they came nearer the pilot waved his hat to call their attention; he also stopped his engine. One of the steamers passed the scow to port, and two on the

starboard. On passing they went so near and at such speed as to create a swell, which broke over the scow and caused her to roll so that she dumped all the chalk into the river. There was room for the steamers to have passed at a greater distance, and they might have reduced their speed, in either of which cases the swell would not have been dangerous.

In addition to these facts the libellant claims to have shown that the hatch covers on the scow were insecurely fastened, and by reason thereof when the swell struck the scow the covers were washed off the hatches, and so a quantity of water was allowed to go into the hold, which by its presence increased the rolling of the scow and was the immediate cause of the loss of the chalk. But I am unable to find such a state of facts. The hatch covers were washed off by the swell and water went below; but the evidence will not justify the conclusion that the water taken in through the hatches conduced in any considerable degree to the loss of the chalk. There is no good reason to doubt that the chalk would have been lost all the same if the hatch covers had not been washed off.

Neither am I able to conclude that there was any negligence in the management of the tug. She was where she had a right to be; was moving at half speed; did all that she could to warn the steamers, and all that she could to mitigate the effect of the swell which the steamers raised.

The case, therefore, presents the question whether, in the absence of any negligence on the part of the defendant or his agents, he is liable for the chalk lost in the manner described. If the relation of the defendant to this cargo was that of a common carrier, his liability cannot well be disputed; for he made an unqualified contract to safely transport and deliver the cargo in question. The non-performance by a common carrier of his contract can only be excused by showing that the loss arose from the act of God or of the public enemy. The swell that overwhelmed the defendant's scow was not the effect of storm or tempest; it was not an act of nature—it was the act of man; namely, of those who were navigating the steamers, and who by their method of navigation raised a swell at this point that it was not possible for the scow to

resist. Damage so caused seems to be strictly analogous to damage caused by collision resulting from faulty navigation.

In the case of collision a vessel is by negligence driven against another vessel. Here, a vessel by faulty navigation drives the water in an irresistible manner upon another vessel and so causes damage.

If such a swell as struck this scow was a necessary incident of navigation in the East river, by such boats as the sound steamers, the case might be different; but upon the evidence before me—none of which, however, comes from the passing steamers—it must be found that the creating of the dangerous swell which caused this loss could have been avoided by reasonable care on the part of the steamers. The damage in question, therefore, was caused by the negligence of man, and not by the act of God.

As no negligence on the part of the defendant or his agents has been shown, the damage in question might no doubt be held to have arisen from a peril of the seas, within the meaning of the ordinary exception of a bill of lading. But the defendant's contract contained no exception. It was an unqualified contract to transport and deliver; and, if it was made by the defendant in the capacity of a common carrier, his responsibility was that which the law, upon grounds of public policy, has attached to every common carrier, namely, that of an insurer against all loss or damage, unless caused by act of God or of the public enemy.

The decision of the case turns, therefore, as I view it, upon the question whether the defendant was transporting this chalk in the capacity of a common carrier. "To constitute one a common carrier, he must make that a regular and constant business; or, at all events, he must for the time hold himself ready to carry for all persons indefinitely who choose to employ him." Redfield on Carriers, 15.

The case of *Lyon* v. *Mills*, 5 East, 428, is the strongest case that I have noticed in support of the plaintiff's contention; but in that case the point whether the defendant was a common carrier or not was not precisely decided. The point actually decided related to a notice limiting defend-

ant's liability; and it does not seem to have appeared in that case, as it does here, that it was no part of the defendant's business to transport the goods of others. In that case, it was the opinion of *Brett*, J., that the defendant could not be held liable as a common carrier, and he says the defendant therein carried on business like any other owner of ships or vessels, which is by no means this case. In the present case the defendant did not hold himself out as ready to transport the goods of others. The proof is that he did no more than to use his scows in his own business, or to let them to others to be used in their business.

Upon the facts of this case, I am, therefore, of the opinion that the defendant's occupation was not that of a common carrier, and that his relation to the chalk in question was simply that of bailee for hire. This being so, in the absence of negligence he is not liable for the loss in question, unless it be also held here, as was held in *Nugent* v. *Smith*, 3 Asp. M. L. C. 87, that every ship-owner who carries goods on board his ship for hire, is, in the absence of express stipulation to the contrary, by reason of his acceptance of the goods, liable as an insurer, except as against the act of God or the public enemy.

The same position was taken by *Brett*, J., in the *Liver Alkali Works* v. *Johnson*, 2 Asp. M. L. C. 337, but it does not seem to have been the opinion of the court in that case; and upon the appeal in *Nugent* v. *Smith* it was distinctly, and I think successfully, challenged by the chief justice. 3 Asp. M. L. C. 198. No American case that I know of has so extended the rule applicable to common carriers; and I think it will be found impossible to apply so rigorous a rule to the transportation business of this country.

Upon these grounds I am opinion that the libel must be dismissed.